## HUDSON and another vs. MCCARTNEY.

BUILDING CONTRACT. (1, 2) *Superintendent's certificate a condition precedent to payment — If withheld, what builder must show, to recover.* (3) *How fraud in withholding certificate must be shown.* (4) *Rights of superintendent under such contract.* . (5) *Pleading and proof in action by builder.*

| 33 | 331 |
| 86 | 251 |
| 33 | 331 |
| 87 | 465 |
| 33 | 331 |
| 89 | 578 |
| 33 | 331 |
| 94 | 393 |
| 94 | 583 |
| 95 | 68 |
| 33 | 331 |
| 100 | 67 |
| 101 | 474 |
| 33 | 331 |
| f103 | 364 |
| 103 | 384 |
| 33 | 331 |
| 112 | [1]414 |
| f112 | [3]542 |

1. It was competent for plaintiffs, contracting to erect a dwelling for defendant, to stipulate that they should receive payment for the work only as the same was executed to the full and complete satisfaction of the person employed to *superintend* the erection of such dwelling, and upon his certificate as the work progressed. And after entering into such stipulation, they cannot recover the price agreed to be paid for the work, except upon the superintendent's certificate, unless his refusal to certify should be disregarded or annulled on the ground of *fraud or bad faith*, or upon clear evidence of *mistake* on his part.

2. Whether plaintiffs could recover in such a case without showing that the certificate was *corruptly* withheld by the superintendent in *collusion with the defendant*, or upon the procurement of the latter, is not decided.

3. If *fraud* in the superintendent or other arbiter in such a case can *ever* be established by proof that the work was in fact duly and properly performed, it can only be in cases where his refusal to certify is shown to have been *grossly* and palpably perverse, oppressive and unjust, so much so that the inference of bad faith would at once arise when the facts were known. Having stipulated to submit to the decision of a skilled arbiter the question whether his work conforms to the contract, the party cannot, in general, *substitute the judgment of a jury* upon that question. *Baasen v. Baehr*, 7 Wis., 521, approved.

4. It was necessarily incident to the authority given the superintendent to withhold his certificate if not satisfied that the work was being executed in accordance with the "true spirit, meaning and intent" of the contract, that he should have power to determine the proper meaning of the contract, plans and specifications, and that his determination should be final and conclusive; and an express provision to that effect in the plans and specifications did not add anything to the force of the contract in that particular.

5. Plaintiffs, in an action upon the contract, cannot *introduce evidence* of fraud or mistake on the part of the superintendent in refusing to grant them such certificates, unless they have *set up the facts in their complaint*.

APPEAL from the Circuit Court for *Winnebago* County.

In April, 1870, plaintiffs entered into a written contract with defendant, to do all the brick and stone work (except, etc.), and furnish mortar therefor, and all the lathing and plastering and furnish materials for the same (with certain exceptions) required in the erection of a dwelling house for defendant, "as

Hudson and another vs. McCartney.

described in the specifications and shown on the plans for said dwelling, and at the time mentioned therein," which plans and specifications were declared to be a part of the contract. And defendant, "in consideration of the said second parties [plaintiffs] fully and faithfully executing the aforesaid work, and furnishing the materials for the same, as before mentioned, so as fully to carry out the design according to its true spirit, meaning and intent, and *to the full and complete satisfaction of J. McDonald, superintendent* of the erection of said dwelling," agreed to pay plaintiff $800, "in payments on the certificates of the architect" as the work progressed. The complaint, after reciting this contract, alleges that plaintiffs, "on or about the 12th of May, 1870, entered upon said employment under said agreement, and *duly discharged all the duties thereof*, and have at great expense collected materials, employed men, and expended much time and money under and pursuant to said contract, and were *so proceeding in all things as in said contract agreed upon* by said plaintiffs, to and including the 27th day of May, 1870;" that, on the day last mentioned, "the defendant ordered and by force drove the plaintiffs and the men in their employ then at work on said building in pursuance of said contract, from said building, and did then and does still" forcibly prevent plaintiffs from further working on said building or under said contract, although plaintiffs have at all times been ready and willing to complete their work under said contract *as therein agreed*, as was well known to defendant: to plaintiffs' damage in the sum of $800, for which judgment is demanded.

The answer admits that plaintiffs commenced work under said contract on the 12th of May, 1870, and that on the 27th of that month defendant ordered them and their workmen to cease work on the building, and refused to allow them to further work thereon *unless they conformed to said plans and specifications.* It further avers that plaintiffs failed to perform their covenants in said contract in the following respects: that in erecting the brick walls of the building, they neglected and

refused, upon repeated requests of defendant, to lay the brick in said wall straight, plumb, or in a workmanlike manner, or to straighten and clip the joints in said walls as required by the plans and specifications, and that they did not execute the brickwork to the satisfaction of J. McDonald, superintendent, etc., and that it was only after they had utterly refused and neglected to conform to the demands of said McDonald, and of the defendant, that they should execute the work according to the plans and specifications, that defendant forbade them from further proceeding, as aforesaid. The answer also alleged a payment of $42.21, and it set up a counterclaim for damages resulting to defendant from the failure of plaintiffs to execute the work according to contract. There was a reply in general denial of the counterclaim.

The "specifications." referred to in the contract contained the following provisions, which were relied upon by the defendant: 1. "In all disputes arising as to the proper interpretation of the plans or specifications, or as to the fitness of workmanship or materials, the decision of the superintendent shall be final." 2. "The whole outside of the building to be laid up with the best quality of sound, hard burned, common brick, * *   *all laid straight and plumb,* * * *   *the joints will be straightened and clipped,*" etc.

Upon the trial, plaintiffs made proof of the amount of work they had done, and the value of the materials they had furnished for the building in question, the length of time they had lain idle in consequence of not being permitted to proceed with the work, and other facts bearing upon the question of the amount of damages to which they were entitled, if any; and they rested without offering any evidence as to the manner in which the work was done. Defendant moved for a nonsuit, which was denied. The superintendent, *McDonald,* as a witness for defendant, then testified: "Plaintiffs laid the water table, with a level foundation, and proceeded to lay the brick to a certain stage, until I notified him [meaning the senior

plaintiff] to do it in a different manner from that in which he was doing it. * * The difference between the manner in which he was doing the work and that which the contract calls for, was in not straightening the joints and clipping. The joint of the mortar should have been *straightened with the straight edge*, and the refuse mortar over and *above the straight edge* should have been clipped off. * * The plaintiffs were using the common manner of laying common brick work,— that is, taking off the mortar, and then pointing it with the edge of a trowel, drawing the edge of a trowel over it as is ordinarily done in common brick work. The work was not done to my satisfaction. I objected to it when it was partially done. This straightening and clipping should be done before the mortar gets too hard. Part of the wall was up as far as I thought it should be before the joint should be finished. * * I requested plaintiffs to do the work in a different manner from that in which they were doing it. He [the senior plaintiff] made objections on the ground that I would not like the work, — it would not suit me. Then I told him it was none of his business; to go and do the work. * * He did some small portion of the work in one corner of the building, nearly in conformity to the design, and then the work seemed to go along without his doing it, and the mortar began to harden, and I required him to do it again. He did not. Then I served a written notice on him to do it. I do not recollect that plaintiffs refused to do the work in the way I wanted, but they did not do it. * * When I found that *Hudson* was not obeying my orders and directions, I served him with the notice to suspend the further execution of the work. It was not being done according to the agreement, and it must stop, or else he must go on in accordance with the agreement."

The testimony of Thompson, living in Wisconsin, a mason and plasterer sixteen years; of Wilson, a builder, contractor and bricklayer, engaged in that business about forty-nine years, and living in Oshkosh; and of Gebo, a mason about fourteen

or fifteen years, and living at Green Bay — confirmed that of McDonald as to the proper meaning of the words "joints straightened and clipped." The defendant himself testified that "when he was young" he had been "engaged in the mason trade" for about ten years, and since that time, though he "had not done any work himself, he had had it done frequently, and superintended it some." He testified in the same manner as McDonald as to the meaning of the words above quoted, and the fact that plaintiffs did not comply with the specifications in that particular.

For the plaintiffs were then called five witnesses: Kellogg, a resident of Green Bay, an architect and builder for about fifteen years; *Hudson, Sr.*, one of the plaintiffs; Meyer, a mason, resident in Green Bay, who had worked upon the building in question as foreman under the plaintiffs; Frost, a mason and builder for twenty-three years, residing at Fond du Lac, who had also done some work upon the building in question as an employee of plaintiffs; and Gunn, a resident of Green Bay, a mason for over thirty years. These all testified, in substance, that the brick work done by plaintiffs was in their opinion "straightened and clipped" as required by the specifications; and that it was not necessary for that purpose to make use of a "straight edge." The last named witness, however, testified that "there are a great many different meanings to the term 'straightened and clipped;' every one seems to have his own definition of it; I don't intend to fix the definite meaning it has among architects."

The plaintiffs also introduced the following evidence as to the state of feeling previously existing in the mind of McDonald toward *Hudson, Sr.;* an objection by defendant, that there was no ground laid in the pleadings for impeaching the good faith of McDonald, being overruled. The witness Frost testified that in a conversation held with McDonald a short time before the work here in question was done, McDonald said that "he liked *Samuel Hudson*, the younger one, but that he had got

through with the old gentleman." The witness Gunn testified that about a year before the contract here in question was let, he had a conversation with McDonald, in which the latter said that he would not allow the elder *Hudson* "to do a job that he had anything to do with; that he wouldn't have him to work on a job."

Mr. McDonald was then recalled for the defendant and testified that he did not believe he had ever made to the witness Gunn the statement testified to by the latter; that he never had any reason for making such a statement to him; that he never had any ill will toward the *Hudsons*, but quite the reverse; that he remembered the conversation referred to by the witness Frost, and that a part of it was about Frost's going into partnership with *Hudson*; that he thought he expressed the opinion that if Frost would go into partnership with the younger *Hudson*, he (McDonald) would do everything he could to further their interests; but that he "would not like to have anything to do with the old man, on account of his being quarrelsome and lawing," the witness added: "I was not instrumental in procuring this job for the plaintiffs, that I recollect. I was favorable to their getting it, and took particular pains to explain the work to them."

After the evidence was all in, defendant again moved for a nonsuit, on the ground that it appeared upon the undisputed evidence that the work was not done to the satisfaction of the superintendent, as the contract required. The motion was denied.

The court instructed the jury, in substance, that if there was no dispute as to what "straightening and clipping the joints" meant, if those words required the work to be done in one particular manner, and there was no dispute as to what that manner was, and if it was done in that manner, then it would be obstinate and unreasonable for McDonald to withhold his assent, and plaintiffs might recover, notwithstanding his refusal to be satisfied with the work; that, on the other hand, if there

were different ways of straightening and clipping the joints, if the words were understood differently by different mechanics, so that from the testimony it could not be ascertained certainly and precisely how the work was to be done, or whether the contract, in that regard, had been complied with, then plaintiffs could not recover without doing the work to the satisfaction of McDonald; that it might, however, be shown, in case McDonald withheld his assent, that he did so fraudulently, or in bad faith; and this would entitle plaintiffs to recover.

Verdict for the plaintiffs, for $175. The defendant moved for a new trial on the ground that the verdict was contrary to the evidence and to the instructions of the court; and that the court erred in refusing a nonsuit, and in submitting to the jury the question of good faith on the part of the superintending architect, there being no evidence in the case to impeach his good faith. The court denied the motion, and rendered judgment upon the verdict; from which the defendant appealed.

*Hastings & Greene*, for appellant, as to the effect of the stipulation to pay upon the superintendent's being satisfied, or upon his certificate, argued, 1. That the satisfaction of the superintendent and the execution of his certificate, were a *condition precedent* to plaintiffs' right of action; and they could not recover until the occurrence of such condition precedent, even though the superintendent withheld his satisfaction and certificate obstinately, or from prejudice, or in bad faith. *Milner v. Field*, 5 Exch., 829, and 1 Eng. L. & E., 531; *Clarke v. Watson*, 18 C. B. (N. S.), 278; *Batterbury v. Vyse*, 2 Hurls. & Colt., 42; *Morgan v. Birnie*, 9 Bing., 672; *Grafton v. Eastern Counties R. R. Co.*, 8 Exch., 699, and 22 Eng. L. & E., 557; [Langdell's L. C. on Contracts, 539, 598, 850, 508, 550]; *Wersley v. Wood*, 6 Term, 710; *Glen v. Leith*, 22 Eng. L. & E., 489; *Butler v. Tucker*, 24 Wend., 447; *Canal v. Dubois*, 15 id., 89, 90, 92; *Smith v. Brady*, 17 N. Y., 173, 175–6; *McCarren v. McNulty*, 7 Gray, 139; *U. S. v. Robeson*, 9 Pet., 319; *McAvoy v. Long*, 13 Ill., 147; 1 Hilliard on Con., pp. 127, 128. Counsel

both criticized and distinguished the case of *Thomas v. Fleury*, 26 N. Y., 26.    2. That if the fraud or bad faith of the superintendent in withholding his satisfaction were any excuse for the nonperformance of this condition precedent, this could not be shown under the pleadings.    Under an allegation of performance, an excuse for nonperformance is not admissible; but such excuse must be specifically pleaded.    *Avery v. Scott*, 20 Eng. L. & E., 334; *Oakley v. Morton*, 1 Kern., 30; *Brown v. Overbury*, 34 Eng. L. & E., 610; *Grafton v. Eastern Counties R. R.*, 22 id., 557; *Milner v. Field*, 5 Exch., 829; 7 Barb., 169; 2 Wend., 399; 8 Johns., 392; 9 id., 115; *Warren v. Bean*, 6 Wis., 120; *Baasen v. Baehr*, 7 id., 516.    3. That the evidence utterly failed to show fraud or bad faith on the part of McDonald.    The utmost attempted to be shown was, that at sometime, long before he was called upon to decide on plaintiffs' work, he was not on very good terms with one of the plaintiffs.    Evidence that the work was done according to the contract cannot be received to show bad faith on his part.    Otherwise the clause requiring the work to be done to his satisfaction is useless.

II. As to the effect of the stipulation that in all disputes as to the interpretation of the plans and specifications, or as to the fitness of workmanship, the superintendent's decision should be final, counsel argued, 1. That the clause is a prospective submission to arbitration, and the decision of the superintendent, when made, is an award, which can only be impeached for fraud or mistake.    *Smith v. Boston R. R.*, 36 N. H., 458; *Underhill v. Cortlandt*, 17 Johns., 405; *Leonard v. House*, 15 Ga., 473; *Robinson v. Fiske*, 25 Me., 401; *Lauman v. Young*, 31 Pa. St., 306; *Reynolds v. Caldwell*, 51 id., 298; *Jebb v. McKiernan*, Moody & Malk., 340; *Hopkins v. Gilman*, 22 Wis., 476; *Lansing's Appeal*, 10 id., 120; *Baasen v. Baehr*, 7 id., 516; *Cleworth v. Pickford*, 7 Mees. & W., 314.    2. That fraud or mistake, to be available to impeach the decision, must be alleged fully and specifically.    *Baasen v. Baehr, supra*; *Perkins v. Giles*, 53 Barb., 342.    3. That there was no evidence of either

fraud or mistake on the part of the umpire. The fact that the judgment of others brought them to a different conclusion from that reached by him, is immaterial. Even if he erred in judgment, this is not the kind of mistake intended by the rule. *Robinson v. Fiske*, 25 Me., 401; *Boston Water Co. v. Gray*, 6 Met., 131.

*Hudd & Wigman*, for respondents, contended that the court properly charged the jury as to the effect of a want of good faith on the part of the superintendent (7 Wis., 516; 26 N. Y., 26; 39 id., 377); that there was evidence enough to carry the question to the jury; and they undoubtedly found that he was not acting in good faith. They further contended that proof of McDonald's mistake or bad faith was admissible under the complaint; or, if otherwise, that the complaint was amendable (Tay. Stats., 1445, § 35, and 1446, § 41), and, the evidence being all in, the judgment would not be issued on that ground.

DIXON, C. J. The questions argued by counsel for the defendant are all fairly presented by the exceptions taken to the order overruling the second motion for a nonsuit made at the close of the testimony, and to the order denying the motion for a new trial; and the same need not, therefore, be examined with reference to the charge of the court, or the exceptions taken, or supposed to have been, to the charge.

And the questions so presented are by no means intricate or doubtful. In view of the numerous adjudications which have been made upon them, and which are collected and referred to by counsel for the defendant, they may be said to be very plain and easy ones. Our views respecting them correspond very nearly, if not fully, with those expressed by the defendant's counsel. It was clearly competent for the plaintiffs to stipulate that they should only demand or receive payment for the work as the same was executed to the full and complete satisfaction of McDonald, the superintendent of the erection of the dwelling, and upon his certificates as the work progressed; and such

satisfaction of the superintendent, and the execution of the certificate by him, became and was a condition precedent to the right of the plaintiffs to demand or sue for the price agreed to be paid by the defendant for the work, unless the refusal to certify should be disregarded or annulled on the ground of fraud or bad faith, or clear evidence of mistake on the part of the superintendent. And should the certificate be fraudulently or corruptly withheld by the superintendent, it would still be the opinion of some most respectable courts that there could be no recovery against the defendant, unless the withholding was in collusion with him and by his procurement. It has been held that the refusal to accept or certify must be shown to have been the wrongful or fraudulent act of the defendant or opposite party to the contract, as well as of the surveyor or architect. *Clarke v. Watson*, 18 C. B., N. S. (114 E. C. L.), 278; *Batterbury v. Vyse*, 2 Hurl. & Colt., 42.

And the case of *Thomas v. Fleury*, 26 N. Y., 26, cited and relied upon by counsel for the plaintiff, and some remarks in the opinion in which seem to be at variance with the uniform tenor of decision both in that state and elsewhere, clearly recognizes the precedent and qualifying nature of the condition requiring the certificate to be procured. Speaking of the earlier stages of the work, and before it had been completed and possession taken of it by the defendant, the court say : " At these stages, if the architect was not satisfied, he could withhold the certificate, and without it the defendant could refuse to pay."

But we are not called upon to ponder or decide the question as to when or under what circumstances bad faith or fraud in the superintendent will operate to relieve against his refusal to give the certificate, or to make the promise to pay obligatory upon the defendant without the certificate. There was no evidence that the superintendent acted either fraudulently or corruptly in his refusal to certify, or in the suspension of the further prosecution of the work by the plaintiffs. His conduct appears to have been fair and just, and in pursuit of what he

conceived to be his duty in the situation. There may have been a scintilla of evidence, but no more, tending to show some disagreement or rupture between the superintendent and one of the plaintiffs a considerable time before ; but there was nothing to justify the conclusion that he was actuated by malice or ill will, or that he behaved dishonestly and partially in the premises.

Neither do we think the case was one where the jury should have been permitted to go into evidence of the manner in which the work was executed, for the purpose of impeaching the decision of the superintendent or arbiter. The case should no more have been submitted to the jury upon this as evidence to establish fraud in the superintendent, than upon the other evidence just spoken of and which was offered with the same design. If fraud in the arbiter can ever be established by proof that he refused to certify the execution of the work when the same had been duly and properly performed, it can only be in those cases where the refusal is shown to have been grossly and palpably perverse, oppressive and unjust, so much so that the inference of bad faith and dishonesty would at once arise when the facts are known. No such facts were presented by this case, and, as argued by counsel for the defendant and sustained by the adjudications, it is not upon every claim made by the mechanic or workman that he has complied with his contract, or upon every controversy arising between him and the arbiter, that the power of deciding is to be taken away from the latter, and the question carried into a court of law, there to be determined by a jury of twelve inexperienced men, or by the judge of the court alone. If this were otherwise, and if, upon every difference springing up between the superintendent and the party contracting to do the work, the former is deprived of all authority to decide, then such covenants and stipulations entered into between parties become utterly nugatory and useless. But such is not the view which has uniformly been taken by the courts, by which such stipulations have been held valid and effectual to secure to the party in whose favor they are made

the advantage of having the work inspected and its quality and character determined, with reference to the requirements of the contract, by a person of adequate skill and ability to form a correct judgment in such matters. "Every man is the master of the contract he may choose to make; and it is of the highest importance that every contract should be construed according to the intention of the contracting parties. And it is important in a case of this description, that the person for whom the work has been done should not be called upon to pay for it until some competent person shall have certified that the work has been properly done according to the contract and specifications." Per ERLE, C. J., in *Clarke v. Watson, supra.* It is manifest that this important object will be defeated, and the protection of a skilled and experienced superintendent lost, if in every case of disagreement or dissent on the part of the contractor, the opinion of a jury is to be substituted. Having deliberately and of his own free will made choice of a person as fit and competent to decide, and by whose determination he has agreed to abide, it is but reasonable and proper that the contractor should be held to the performance of his agreement. The case here presented differs not, therefore, from those which have frequently arisen and been decided upon contracts of this description, and with respect to which the general rule of law is correctly stated in *Baasen v. Baehr*, 7 Wis., 521. That was the case of an agreement to pay for extra work at the estimate of an architect agreed upon, and it was held that the contractor must abide by such estimate. This court said: "The parties saw fit to make the architect the umpire between them, and if he exercised his best judgment, in good faith, and with an honest intention of determining the real value of the extra work, his estimates are binding upon them. His decision ought not to be disturbed without some statement going to show that it was made under a mistake, or was not honest. Clauses in contracts analogous in principle to the one now under consideration, have frequently been construed by courts, and the general

rule is to hold the parties to the stipulations of their contract, unless they show some good reason for disregarding the decision made by the umpire mutually chosen for that purpose." If fraud or bad faith is relied upon, such good reason would be shown, according to the decisions of the English courts, when it appeared that the other party colluded with the architect or encouraged or procured the wrongful decision.

But the contract in this case contained a further provision, found in the plans and specifications which were expressly declared to be a part of the contract, and which provision was as follows: "In all disputes arising as to the proper interpretation of the plans and specifications, or as to the fitness of the workmanship or materials, the decision of the superintendent shall be final." The dispute in this case arose upon the interpretation of the plans and specifications — the superintendent holding to one interpretation, and the plaintiffs contending for another. The plaintiffs refusing to yield to the decision of the superintendent, and persisting in the execution of the work according to their interpretation, the superintendent declared his dissatisfaction and refusal to accept or to certify, and thereupon gave notice of a suspension of the work, and further performance of the contract was ended.

It is said by counsel for the defendant, that this last clause was a prospective submission to arbitration, which having taken place, and the decision been made, the same is final and conclusive between the parties, unless impeached for fraud or mistake. This is the assertion of an undoubtedly correct legal proposition according to the view taken by counsel. But we are inclined to look upon the clause as something different from a mere prospective submission to arbitration before an arbitrator or arbitrators named or to be named, and rather as the express delegation of a power, which, if no such clause had been inserted, would have existed as an incident to, or been implied from, the general authority already conferred upon the super-

intendent. It was necessarily incident to the authority previously given to the architect to grant or withhold his certificate according as he should or should not be satisfied that the work was being executed in accordance with the "true spirit, meaning and intent" of the contract, that he should have the power of interpreting and determining the proper construction and meaning of the contract, plans and specifications, and that such determination should be final and conclusive. In the performance of his function as arbiter of the character of the work and quality of the materials, and of their correspondence with the requirements of the contract, the first question arising and to be decided would have been upon the terms of the contract itself, and what was meant and intended by it, both as to the kind of materials to be furnished and the style of work to be performed. The clause in question must therefore, we think, be regarded as the express mention of an incidental power, which was inserted from motives of extreme caution, and so as to avoid the possibility of doubt. It was foreseen to be extremely necessary in the progress of the work, and when delay was impossible, that the architect, in the discharge of his duties, should possess this power; and out of a superabundance of caution, it was expressly delegated.

A late case in the court of appeals, *Pres't, etc., Canal Co. v. Pa. Coal Co.*, 50 N. Y., 250, to which our attention has been directed since the argument of this cause, fully sustains the views above expressed as to the general principles of law governing contracts of this nature. The opinion of the court by ALLEN, J., is valuable for the discussion it contains and the authorities it collects and reviews, and particularly so for the clear and accurate distinctions which it draws between those covenants for submission and conditions which are precedent in their nature and oust the courts of jurisdiction or bar the action of the plaintiff, and those which are not so, and as to which he may have his remedy for the recovery of damages. See also *Pappa v. Rose* (L. R., 7 C. P., 32), and *Kimberley v. Dick* (L. R.,

13 E. C., 1), reported in 1 Eng. R. (Moak), 87 and 511, and cases there cited in notes.

There is another point made by counsel for the defendant in which we also agree. We agree that evidence to show fraud or mistake in the superintendent was inadmissible, because no such averments of fact were contained in the complaint. To justify the admission of such evidence, the facts should have been alleged, as will appear from the authorities above cited, if in truth the same were not sufficiently apparent without. The defendant is entitled to know the ground of recovery relied upon, in order that he may be able to meet and offer proof against it. The complaint in this case, to have been good according to the nature of the proofs offered and relied upon at the trial, should have averred that the condition precedent had been complied with, namely, that the work had been done to the satisfaction of the superintending architect, and that he had granted his certificate, or otherwise it should have averred facts excusing such compliance. *Fox v. The Railroad,* 3 Wallace, Jr., 243. The complaint did neither, nor was either made out by proofs on the trial; and no evidence whatever was offered to show the wrongful and forcible expulsion of the plaintiffs from the work by the defendant, as alleged in the complaint. The attempt to prove fraud or mistake in the architect was a failure, the evidence rather preponderating in favor of his decision upon the proper interpretation of the plans and specifications, than being against it. But whether the evidence so preponderated or not, that was a question for the architect to decide, and not, under the circumstances of this case, to be submitted to a jury. The court should have granted the motion for a nonsuit made when the testimony closed, as also that first made; and failing in those, the motion for a new trial should have been granted.

*By the Court.* — The order of this court is, that the judgment of the court below be reversed, and the cause remanded with direction that a new trial be granted according to law.